**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 09-cv-01887-CMA-BNB

CHRISTOPHER DAVID DALGARN,

      Plaintiff,

v.

RODNEY D. JOHNSON, in his official capacity as Sheriff
   of Grand County, Colorado, and
DEPUTY ROCHALLE L. ROOKS, Individually,

      Defendants.

---

## ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

---

      This is a civil rights action brought under 42 U.S.C. § 1983.  Plaintiff Christopher

David Dalgarn alleges that Defendants Rodney D. Johnson, in his official capacity

as Sheriff of Grand County, and Deputy Rochalle L. Rooks, individually, are liable for

excessive force in connection with a collision and shooting on October 6, 2008.  The

case is before the Court on Defendants' "Re-Filed Motion For Summary Judgment."

(Doc. # 70.)  Jurisdiction is proper pursuant to 42 U.S.C. § 1983 and 28 U.S.C.

§ 1343(a)(3) and (4).  For the following reasons, the Court denies Defendants' motion

in part and grants it in part.

## I.  BACKGROUND

The following facts are undisputed unless noted.  The Court will elaborate on them, as needed, in its analysis.

On October 6, 2008, around 7:00 p.m., Defendant Rooks, a deputy sheriff with the Grand County Sheriff's Department, was on patrol.  He received a dispatch that a black Ford Focus heading eastbound on U.S. 40 was speeding and driving carelessly. The driver of the black Ford Focus was Plaintiff, who was headed to the town of Winter Park to return a movie.  He was angry.  He began speeding and at times was driving on the opposite side of the road.

Upon seeing Plaintiff's vehicle, Rooks pulled out to follow.  He turned on his overhead lights and honked his horn.  He did not have a functioning siren.

Rooks pursued Plaintiff for about two miles.  In so doing he lost control of his car, at least temporarily.  He caught up to Plaintiff and eventually struck Plaintiff's vehicle on the driver's side.  He did so intentionally.  Both cars came to a stop.

The details of what happened next are disputed.  The basics, however, are not. Both Plaintiff and Rooks exited their vehicles.  Plaintiff was unarmed.  Rooks fired his gun at Plaintiff from close range.  He contends he repeatedly warned Plaintiff.  Plaintiff, however, did not hear any warnings – nor did several witnesses.  Rooks fired between three and eleven shots at Plaintiff.  Three of them struck Plaintiff.  One of the bullets transected Plaintiff's cervical spinal column, resulting in immediate paralysis.

On August 27, 2009, Plaintiff filed an amended complaint alleging four claims for relief. Against both defendants, he alleges (1) excessive force in the automobile collision and (2) excessive force in shooting. Against Defendant Johnson only (in his official capacity), Plaintiff alleges he (3) failed to properly train and supervise Defendant Rooks and (4) was deliberately indifferent in retaining Rooks as an employee and assigning him to patrol duty. (Doc. # 7.)

On June 11, 2010, Defendants filed the at-issue motion for summary judgment. Plaintiff filed a response on June 25, 2010, to which Defendants replied on July 16, 2010.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that

a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248)).

**B.    ANALYSIS**

Defendants assert they are entitled to summary judgment on several grounds. As to Defendant Rooks, they argue he is entitled to qualified immunity. As to Defendant Johnson, they argue Plaintiff's claims fail as a matter of law. The Court will address each ground in turn, beginning with the question whether Defendant Rooks is entitled to qualified immunity.

1.    <u>Defendant Rooks</u>

When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party.

*Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009) (citations and quotation marks omitted). Given the procedural posture, the Court, in deciding whether Plaintiff has met his burden showing a constitutional violation, disregards his unsupported allegations. That is, before the Court will accept Plaintiff's version of the facts, those facts must be supported by evidence in the record. *Id.*; *Simkins v. Bruce*, 406 F.3d 1239, 1241 (10th Cir. 2005) ("The threshold inquiry is whether the alleged

facts [,]or, on summary judgment, the **evidenced** facts[,] taken in the light most favorable to the plaintiff show a constitutional violation.") (emphasis added).

In his first two claims, Plaintiff alleges Defendants deprived him of his Fourth Amendment right to be free from unreasonable seizure. In particular, he alleges Rooks used excessive force when Rooks intentionally collided with Plaintiff's car and shot Plaintiff. (Doc. # 7, ¶¶ 18-39.)

> An officer using force in the course of a seizure of a citizen is entitled to qualified immunity unless the level of force violated clearly established Fourth Amendment law. This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. The precise question asked in an excessive force case is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Thomson*, 584 F.3d at 1313 (internal citations, explanatory parentheticals, and quotation marks omitted).

Relevant factors for the Court to consider include the alleged crime's severity, the suspect's efforts to resist or evade arrest, and whether the suspect poses an immediate threat to the safety of the officer or others. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002). The reasonableness of the officer's conduct must be assessed "'from the perspective of a reasonable officer on the scene,' acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Id.* (quoting *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001)).

An officer's use of deadly force is reasonably only if a reasonable officer in his position would have had probable cause to believe that there was a threat of serious

physical harm to themselves or to others. *Thomson*, 584 F.3d at 1313. The term "deadly force" encompasses a range of applications of force, including those likely to cause serious injury or death, such as ramming a fleeing suspect's car. *Cordova v. Aragon*, 569 F.3d 1183, 1189 (10th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 384 (2007)). However, regardless of the degree of force used, the Court must still "slosh [its] way through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 382. Thus, whether or not Rooks's actions constituted deadly force, all that matters is whether his actions were reasonable. *Id.*

       a)    *Whether Rooks is entitled to qualified immunity on Claim One – The Collision*

The Court first addresses whether Rooks is entitled to qualified immunity on Plaintiff's first claim—which alleges excessive force in the collision. As mentioned, the Court must evaluate the evidence in light of the totality of the circumstances. It views the evidence and reasonable inferences in Plaintiff's favor. *See Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003) (observing that courts should not credit defendants' versions of events, but rather, as is proper, "the factual matrix most favorable to [the plaintiff]."). In so doing, the following facts emerge.

Rooks received a dispatch that a possible drunk driver was heading east on highway 40. He positioned himself at an intersection along highway 40 and waited. He saw the at-issue vehicle (driven by Plaintiff) pass and began his pursuit. He observed Plaintiff violate three maybe four traffic laws, including reckless driving.[1] Rooks was

---

[1]  (Doc. # 72-4, Ex. 4, Deposition of Rooks, at 137:9-21.)

unaware Plaintiff had violated any other laws.[2]  Prior to Rooks colliding with Plaintiff,

Winter Park police officer Roy Ybarra had announced over the radio that he was en

route and could set up "stop sticks" outside Fraser before Plaintiff arrived.[3]

Plaintiff looked back and saw the flashing lights of Rooks's vehicle.  He watched

as Rooks swerved out of control behind him.[4]  Witnesses (in their cars) observed Rooks

weave across the center line of the highway several times.[5]  It is unclear whether Rooks

overcame Plaintiff before the collision.[6]  In any event, Plaintiff decided to pull over.[7]

He began slowing down and was under 30 miles-per-hour when Rooks decided to

"T-bone" him.[8]  Rooks admits he intentionally rammed Plaintiff's car on the driver's

side.[9]  He did so with such force that all four wheels of the SUV came off the ground.[10]

No pedestrians were nearby when Rooks collided with Plaintiff.[11]

In summary, then, Rooks, having observed Plaintiff commit only traffic offenses,

and with another officer positioned to deploy stop-sticks, intentionally rammed Plaintiff's

---

[2]  (*See id.* at 137:14-138:3.)

[3]  (Doc. # 72-13, Ex. 13, Deposition of Roy Ybarra, at 14:20–15:25.)

[4]  (Doc. # 72-8, Ex. 8, Deposition of Plaintiff, at 162:11-22; 164:7-25.)

[5]  (Doc. # 72-9, Ex. 9, Affidavit of Kayla Schrader, ¶ 3; Doc. # 72-10, Ex. 10, Affidavit of Euel Choate, ¶ 3.)

[6]  (Doc. # 72-9, ¶¶ 3-5; Doc. # 72-10, ¶¶ 3-5.)

[7]  (Doc. # 72-8 at 164:7-25.)

[8]  (*Id.*; Doc. # 72-12, Deposition of Euel Choate, at 30:12-24)

[9]  (Doc. # 70-4, Incident Narrative, at 2; Doc.# 72-4 at 112:16-22.)

[10]  (Doc. # 72-9, ¶ 5; Doc. # 72-10, ¶ 5.)

[11]  (*See* Doc. # 72-4 at 219-20.)

vehicle, on the driver's side, though it was slowing to a stop.  Based on these facts, all of which find support in the record, the Court finds Plaintiff has met his burden showing that Rooks violated Plaintiff's right to be free from excessive force when he collided with Plaintiff's car.[12]

The Court concludes its analysis on this claim with two more findings.  First, the Court finds that Rooks's ramming of Plaintiff's vehicle constituted deadly force.  *See Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) ("[o]nce the relevant facts are determined with all reasonable inferences drawn in favor of the non-moving party at the summary judgment stage, 'whether [the suspect's] actions have risen to a level warranting deadly force . . . is a pure question of law.'") (quoting *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007)).  In *Scott*, the Supreme Court acknowledged that an officer applying his push bumper to the rear of a fleeing vehicle can constitute deadly force. 550 U.S. at 384 ("[the police officer's] actions posed a high likelihood of serious injury or death to [the suspect]").  This finding colors the "reasonableness" inquiry.  *See Tennessee v. Garner*, 471 U.S. 1, 3 (1985) ("We conclude that [deadly] force may not

---

[12]   This finding, of course, also means that genuine issues of material facts exist as to whether Rooks used excessive force in colliding with Plaintiff's car.  Thus, the Court must deny Defendants' motion.  As stated by Judge Miller of this court, "a summary judgment motion may not be granted on any excessive force claim under § 1983 for which any genuine issue of material fact remains-regardless of whether the potential grant would arise from qualified immunity or from a showing that the officer merely had not committed a constitutional violation." *Norris v. City of Aurora*, No. Civ.A.03CV1334WDMBNB, 2005 WL 1768758, *3  (D. Colo. July 25, 2005) (unpublished). *See also Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) ("[e]ven when the district court concludes issues of material fact remain, we have reviewed the legal question of whether a defendant's conduct, as alleged by the plaintiff, violates clearly established law.  We do so again here, . . . [b]ecause that answer is based on the assumed correctness of [the plaintiff's] version, it is not of course the final answer.  It will rather be for the ultimate trier of fact to resolve which of the sharply disputed factual versions is to be credited, and hence whether [the plaintiff's] clearly established constitutional rights were or were not actually violated.) (internal citations omitted).

be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.").

Second, despite Plaintiff's failure to identify a case directly on point, the Court finds Plaintiff's right to be from deadly force was sufficiently defined such that a reasonable official in Rooks's position would have had fair warning what he was doing violated that right. ); *Carr v. Castle*, 337 F.3d 1221, 1227 n. 7 (10th Cir. 2003) ("the right to be free from deadly force is a clearly established right[.]") (citation omitted). Because Plaintiff was slowing to a stop after committing what Rooks thought were only traffic offenses and because no pedestrians were nearby, it was unreasonable for Rooks to use deadly force to seize Plaintiff. Accordingly, the Court finds Rooks is not entitled to qualified immunity on Plaintiff's first claim.[13]

> b) *Whether Rooks is entitled to qualified immunity on Claim Two – The Shooting*

The Court also finds Rooks is not entitled to qualified immunity on Plaintiff's second claim. Viewing the evidence in Plaintiff's favor, the facts show Rooks violated Plaintiff's clearly established Fourth Amendment right when he emerged from his vehicle and shot Plaintiff.

---

[13] Defendants argue Plaintiff cannot show he suffered damages as result of Rooks's decision to ram his vehicle, citing "undisputed" facts. (Doc. # 70 at 14.) As will be discussed, though, the Court finds many of these facts are in dispute. In other words, genuine issues of material fact exist as to whether Plaintiff suffered injuries as a result of the Rooks's decision to ram Plaintiff's vehicle.

Within three seconds of the vehicles coming to rest, Rooks, without warning, drew his gun and began firing at Plaintiff.[14] He fired eleven shots.[15] Plaintiff was unarmed.[16] He never charged Rooks.[17] Nor did he swing his arms at or touch Rooks.[18] A dispute exists as to whether Plaintiff cried out – "shoot me, cop!" According to the Investigative Memorandum of an investigator, Plaintiff told the investigator he said "shoot me, cop, shoot me, cop." However, in his deposition, Plaintiff testified he said nothing.[19] The evidence is similarly vague with respect to whether Plaintiff had an "encounter" with Rooks.[20] Or, if he did, what that "encounter" entailed. For example, Defendants assert that Plaintiff could not recall whether he "touched" Rooks. It is true Plaintiff stated in his deposition he did not know whether he touched Rooks.[21] However, he also stated he knew he did not touch Rooks.[22] In any event, even if Plaintiff did "touch" Rooks, the point is not dispositive. Other questions remain affecting

---

[14] (Doc. # 72-9, ¶¶ 6, 8; Doc. # 72-10, ¶¶ 6, 8; Doc. # 72-12 at 30:4–31:7.)

[15] (Doc. # 72-17, Ex. 17, Rooks' Statement dated October 14, 2008, at 11-13; Doc. # 72-18, Ex. 18, Deposition of Leo Piechocki, at 51-52).

[16] (Doc. # 72-33, Ex. 33, Defendants' Objections and Responses to Plaintiff's Requests for Admissions, at 7.)

[17] (Doc. # 72-8 at 172:13-15.)

[18] (*Id.* at 171:23-172-9; Doc. # 72-13 at 21:10-12; *See* Doc. # 72-9, ¶ 6; Doc. # 72-10, ¶ 6.)

[19] (*Compare* Doc. # 70-11, Ex. A-11, Investigative Memorandum of Ellis Armistead, at 2, *with* Doc. # 72-8 at 171:8-12.)

[20] (*Compare* Doc. # 72-8 at 168:11 to 169:2 *with* Doc. # 70-11 at 3.)

[21] (Doc. # 72-8 at 172:10-11.)

[22] (*Id.* at 172:7-8.)

the "reasonableness" of Rooks's decision to use deadly force. What kind of "touch" was it? A grapple for the gun or an attempt at self-defense? And at what point did he "touch" Rooks – before or after he was shot? It is undisputed Plaintiff was shot three times.[23] And given the evidence Plaintiff was shot within three seconds of the vehicles coming to rest, that suggests a very brief "encounter" with limited opportunity to "touch." Viewing the evidence in Plaintiff's favor, the Court can construct various interpretations of what happened that night. Included in those are scenarios where regardless of Plaintiff's "touching," eleven shots constitutes excessive force.

Defendants cite *Blossom v. Yarbrough* as "instructive" of how the Court should proceed in this case. 429 F.3d 963 (10th Cir. 2005). The Court agrees, but not in the way Defendants envision. The *Blossom* defendant, Deputy Yarbrough, responded to a call regarding an intoxicated person who would not get out of another person's car. After making contact with the suspect and attempting to reason with him, the suspect fled. *Id.* at 964-65. Yarbrough pursued and the suspect jumped from behind a stack of wooden pallets screaming he was "going to take [Yarbrough's] gun and shove it up [Yarbrough's] a--," and that he was tired of cops "f---ing with him." Yarbrough retreated and told the suspect to stop. *Id.* The suspect kept advancing and Yarbrough warned he would shoot because he could not back up any further. *Id.* When the suspect refused to stop his advance and reached for Yarbrough's gun, Yarbrough shot and killed him. *Id.*

---

[23] (Doc. # 72-8 at 169:7-14.)

The court found that Deputy Yarbrough was entitled to qualified immunity. That case, however, is not analogous to this one. The critical distinction between the two is that the *Blossom* facts were largely undisputed. *Id.* at 967. This was due, in part, because the *Blossom* suspect, Mr. Pickup, was dead. Thus, he could not tell his side of the story. The plaintiff in *Blossom* was his mother. Given her absence from the scene, she was unable to dispute several important facts. *Id.* at 966.

> Ms. Blossom does not dispute the facts tending to show that her son engaged Deputy Yarbrough and was confrontational and aggressive; that Deputy Yarbrough tried to diffuse the confrontation and warned Mr. Pickup several times to get on the ground; that Mr. Pickup was larger than the officer; that Deputy Yarbrough believed Mr. Pickup at the time to be drunk, high and possibly armed; that the deputy knew there were civilians nearby; that he was alone and in the dark; and that he shot Mr. Pickup from a distance of five to seven feet. This account is consistent with the forensic evidence and the testimony of Ms. Blossom's own expert.

*Id.* at 967.

Here, in contrast, Rooks's account is disputed. Plaintiff testified that Rooks shot him without warning. He also testified he did not touch Rooks; that he did not swing his arms at Rooks. In addition, two witnesses, Mr. Choate and Ms. Schrader, swore that only three seconds passed between the time the cars came to rest and when shots were fired. This supports Plaintiff's account that Rooks shot him without warning. It also suggests the two did not have an encounter on the ground – as Rooks maintains. Moreover, unlike Deputy Yarbrough in *Blossom,* who thought Mr. Pickup had a knife, Rooks never averred he thought Plaintiff was armed. Yet the evidence suggests he

fired as many as eleven shots at Plaintiff.  Given this evidence, the Court finds Plaintiff has met his burden of "showing" Rooks used excessive force in shooting Plaintiff.[24]

The Court also finds the law regarding the use of deadly force was clearly established at the time of the shooting, *i.e.*, Rooks should have known what he was doing constituted excessive force.[25]  *See Rossiter v. Robinson*, --- F.Supp.2d ----, Civ. No. 08-cv-01661, 2010 WL 2301783, *3 (D. Colo. June 8, 2010) ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.") (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).  That is, viewing the facts in Plaintiff's favor, it was clearly established that "a police officer may not seize an unarmed, nondangerous suspect by shooting him . . . ."  *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003).  Accordingly, the Court finds Rooks is not entitled to qualified immunity on Plaintiff's second claim.

---

[24]  *See Walker v. City of Orem*, 451 F.3d 1139, 1160-61 (10th Cir. 2006) (no immunity where officers shot decedent after a car chase, crimes of vehicle theft and eluding police were "not particularly severe," and decedent was armed only with a knife); *Carr v. Castle*, 337 F.3d 1221, 1225, 1227 (10th Cir. 2003) (no qualified immunity where testimony differed on whether officers shot decedent before or after decedent threw piece of concrete at officers); *Zuchel v. Spinharney*, 890 F.2d 273, 275-76 (10th Cir. 1989) (no immunity where officer shot "disturbed and disoriented transient" where there were factual disputes as to whether decedent was charging or stabbing at the officer, whether he was holding a weapon, or whether the officer verbally warned the decedent before shooting).

[25]  *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009) ("There is no question that the general principle governing the use of force is clearly established: deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others.") (citing three cases decided before October 6, 2008)).

2.    Sheriff Johnson (Grand County Sheriff's Department)

Plaintiff is also suing Rooks's former supervisor, Sheriff Johnson. His claims,
however, are directed at Johnson in Johnson's official capacity as Sheriff of Grand
County. "[A] judgment against a public servant 'in his official capacity' imposes liability
on the entity that he represents . . . ." *Brandon v. Holt*, 469 U.S. 464, 471 (1985); *see
also, e.g., Meade v. Grubbs*, 841 F.2d 1512, 1529 (10th Cir. 1988). Thus, Plaintiff's suit
against Johnson is the same as a suit against the county. *See Martinez v. Beggs*, 563
F.3d 1082, 1091 (10th Cir. 2009). Because of this, Johnson cannot assert the defense
of qualified immunity.[26]

Instead, Defendants assert he is entitled to summary judgment because
Plaintiff's claims fail as a matter of law. They raise several specific arguments in
support. The Court addresses each in turn.

a)    *Whether Plaintiff must demonstrate Sheriff Johnson's "personal
participation"*

First, Defendants assert Plaintiff's excessive force claims fail because Johnson
did not personally participate in either the collision or the shooting. This is true. It is
undisputed Johnson was not involved in the decision to ram Plaintiff's car or to shoot
Plaintiff. This assertion, however, misconstrues Plaintiff's theory of liability. Because
the claims are directed at Johnson in his official capacity, Plaintiff need not show that
Johnson himself was "personally involved" in the alleged deprivations. *See Fogarty v.*

---

[26]    *See Moore v. City of Wynnewood*, 57 F.3d 924, 929 n. 4 (10th Cir.1995) ("the
defense of qualified immunity only applies to [defendants] in [their] individual capacit[ies]").
*See also Mitchell v. Forsyth*, 472 U.S. 511, 556 n. 10 (1985) (concurring/dissenting opinion of
Justice Brennan) ("Of course, an official sued in his official capacity may not take advantage of
a qualified immunity defense") (citing *Brandon v. Holt*, 469 U.S. 464 (1985)).

14

*Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008); *Bruce v. Beary*, 498 F.3d 1232, 1248-49 (11th Cir. 2007). Rather, Plaintiff must show that the Sheriff's Department was involved in the alleged deprivations.[27] Plaintiff's claims against the Department reflect the various ways Plaintiff attempts to demonstrate this involvement.

        *b)*    *Claims One and Two – Whether Department policy, custom, or practice was the "moving force" behind Rooks's use of excessive force*

All four of Plaintiff's claims are directed at Sheriff Johnson in his official capacity. The first two allege excessive force as discussed above. Plaintiff asserts the Department is liable because "[t]he policies, customs, and practices of the Department were the moving force behind, and directly caused, the violation of [Plaintiff's] rights." For the county to be liable under this theory, Plaintiff must show: 1) that a Department employee committed a constitutional violation; and 2) a Department policy or custom was the moving force behind the constitutional deprivation. *Ireland v. Jefferson County Sheriff's Dept.*, 193 F. Supp. 2d 1201, 1227 (D. Colo. 2002) (citing *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998).

Defendants argue Plaintiff cannot show the existence of a custom, practice, or policy that was the "moving force" behind Plaintiff's alleged constitutional deprivations.[28] In response, Plaintiff concedes this point, stating that "[Plaintiff] need not establish

---

[27] This revelation also defeats another of Defendants' arguments – that Johnson cannot be held vicariously liable for Rooks's actions. Again, this is true. Section 1983 prohibits vicarious liability. *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997); *Dodds v. Richardson*, No. 09-6157, --- F.3d ----, 2010 WL 3064002, *10 (10th Cir. August 6, 2010). But it is also besides the point. Plaintiff is seeking to hold the Department directly, not vicariously, liable for his injuries.

[28] (Doc. # 70 at 22-23.)

the existence of an unconstitutional custom or policy or a pattern of constitutional violations."[29]  Accordingly, because Plaintiff fails to identify a particular policy, custom, or practice that was the "moving force" behind the alleged violation of Plaintiff's fourth amendment rights, the Court will enter summary judgment in favor of Sheriff Johnson on Plaintiff's first two claims.

        *c)*     *Claim Three – Whether the Department failed to train Rooks*

In his third claim, Plaintiff alleges the Department is liable for its failure to train or supervise Rooks.  In the absence of an explicit policy or an entrenched custom, as here, the inadequacy of police training may serve as a basis of § 1983 liability.  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  To impose liability on the Department for its failure to train Rooks, Plaintiff must establish that:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the [sheriff's department] toward persons with whom the police officers come into contact[;] and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Thomson v. Salt Lake County*, 584 F.3d 1304, 1322 (10th Cir. 2009) (quoting *Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir. 1997)).

---

[29] (Doc. # 72 at 27.)

*(i)* <u>Excessive force</u>

The Court has already found that jury questions exist whether Rooks exceeded constitutional limits on the use of force; thus, the first prong is satisfied. The Court also finds that genuine issues of material fact exist as to the remaining elements.

*(ii)* <u>Usual and recurring situation</u>

First, as to whether the situation Rooks faced is usual and recurring for police officers, Defendants fail to satisfy their burden pointing to an absence of evidence on this issue. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (explaining that at summary judgment movant bears initial burden of showing the absence of a genuine issue of material fact and that this can be done by citing a lack of evidence for the other party on an essential element of that party's claim). Accordingly, the Court finds the point conceded.[30] Plaintiff need not, then, set forth specific facts showing a genuine factual dispute on this element.[31] *Id.* at 671 ("**If** the movant carries this initial burden, . . . the burden shifts to the nonmovant to go beyond

---

[30] Perhaps Defendants make no attempt because other courts have found similar facts to be usual and recurring situations for police officers. *Brown v. Gray*, 227 F.3d 1278, 1288 (10th Cir. 2000) (stating that arrests of fleeing suspects constitutes a usual and recurring situation for police officers); *Zuchel v. City and County of Denver*, 997 F.2d 730, 738 (10th Cir. 1993) (finding evidence showed that officers placed in situations where they would have to make split second decisions on whether to shoot constituted usual and recurring situation).

[31] Plaintiff has submitted the opinions of a proffered expert, Mr. Dan Montgomery. He opined that "the situation which Defendant Rooks encountered prior to ramming his car into [Plaintiff] is a usual and recurring situation with which law enforcement officers must deal." (Doc. # 72-34 at 6.) He also opined that [t]he type of confrontation described by Defendant Rooks is a readily foreseeable aspect of police work, and 'shoot-don't shoot' situations are common and are recurring events for police officers, regardless of jurisdiction." (*Id.* at 9.) However, because the admissibility of Mr. Montgomery's opinions is the subject of a pending motion, the Court will not rely on his opinions in determining whether evidence exists supporting Plaintiff's claims.

the pleadings and 'set forth specific facts' . . . from which a rational trier of fact could find

for the nonmovant.") (emphasis added).

<em>(iii)</em>   <u><em>Deliberate indifference and causation</em></u>

The final two elements in a "failure to train" claim are deliberate indifference and

causation.

> A finding of deliberate indifference . . . requires a showing that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [the Department] can reasonably be said to have been deliberately indifferent to the need[.]'  The touchstones of this inquiry, therefore, are the risk inadequate training poses and the [the Department's] awareness of that risk."

*Brown v. Gray*, 227 F.3d 1278, 1288-89 (10th Cir. 2000) (internal citation omitted)

(quoting *City of Canton*, 489 U.S. at 390)).

As to causation, "for liability to attach in a failure to train case, the identified

deficiency in [the Department's] training program must be closely related to the ultimate

injury, so that it actually caused the constitutional violation."  *Carr v. Castle*, 337 F.3d

1221, 1231 (10th Cir. 2003) (citations omitted); *See also Board of County Comm'rs

of Bryan County v. Brown*, 520 U.S. 397, 415 (1997) ("Congress did not intend

municipalities to be held liable unless deliberate action attributable to the municipality

directly caused a deprivation of federal rights.").  On both elements, the Court finds the

evidence sufficient to survive summary judgment.

First, the evidence generally suggests the Department knew Rooks needed

training yet failed to provide it.  In the Department's "pre-employment screening

psychological evaluation," the examining psychologist noted Rooks seemed "rigid in

his thinking and overly restrained or inflexible.  He can also be impatient with delay

18

or indecision."[32]  The psychologist opined that Rooks "will need extremely thorough training and support with clear guidelines and expectations."[33]  Former Department Sergeant Zacek Smith expressed concern over Rooks's performance to Undersheriff Eldridge.[34]  He believed Rooks needed more training and experience before allowing him on the road.[35]  His suggestion that Rooks receive more training was "shut down" by Eldridge.[36]

More specific to driving, the evidence suggests the Department knew Rooks had poor judgment driving yet failed to train him to improve it.  At the time of his application, Rooks had been in two car accidents within three years and had received seven traffic citations within eight years.[37] The Department admits such a driving record is a concern and could "play a part" in disqualifying an applicant.[38]  While employed by the Department, Rooks caused a roll-over accident while off-duty in his own car.[39]  Another time he drove his patrol vehicle into a pole in a parking lot.[40]  He was marked "below

---

[32]  (Doc. # 51-1, Ex. 15A, Sealed.)

[33]  (*Id.*)

[34]  (Doc. # 72-6, Ex. 6, Deposition of Daniel Zacek Smith, at 17:3 to 18:4.)

[35]  (*Id.*)

[36]  (*Id.* at 18:16-17.)

[37]  (Doc. # 72-15, Ex. 15, at 3-4.)

[38]   (Doc. # 72-3, Ex. 3, Rule 30(b)(6) Deposition of Walt Eldridge, at 50:3 to 52:5.)

[39]  (Doc. # 72-4 at 80:5-25.)

[40]  (Doc. # 72-15 at 15-17.)

standard" for driving.[41] Former Department Sergeant Wurm observed Rooks "couldn't drive worth a damn."[42] Former Department Sergeant Zacek-Smith could not recall any specific driving training.[43]

Finally, with respect to firearms and use-of-force, the evidence suggests the Department knew its use-of-force training was inadequate, knew Rooks had poor judgment using a firearm, yet failed to train him in light of that knowledge. The Department's notes from Rooks's oral job interview state that Rooks displayed "immature thinking" as to weapons, "was to [sic] quick to draw his weapon on crowd control scenarios," and had "trouble making some decisions."[44] Undersheriff Walt Eldridge, testifying on behalf of the Department, admitted those observations should have been a "concern" to the Department in hiring Rooks.[45] He also testified the Department could not document that Rooks took part in firearms qualification training at required intervals.[46] Rooks failed his firearms training in 2006 and barely passed another time.[47] Yet despite this failure, Undersheriff Eldridge allowed Rooks to remain on patrol duty.[48] Rooks received no training on decision-making regarding the use of

---

[41] (*Id.* at 25.)

[42] (Doc. # 72-5 at 55:16 to 56:4.)

[43] (Doc. # 72-6 at 24:8-10.)

[44] (Doc. # 72-15 at 18-21.)

[45] (Doc. # 72-3 at 123:11-18; 124:23 to 125:6.)

[46] (Doc. # 72-1, Ex. 1, Rule 30(b)(6) Deposition of Walt Eldridge, at 70:19 to 71:19.)

[47] (Doc. # 72-5, Ex. 5, Deposition of Bus Wurm, at 73:11-25.)

[48] (*Id.* at 74:13-22.)

force and weapons.[49]  Former Department Sergeant Zacek-Smith considered the

Department's training inadequate.[50]  The Department apparently agrees.  Sergeant Neal

McQuarie, testifying on behalf of the Department, stated that, from 2005 to 2008, the

Department's training of patrol deputies was inadequate.[51]  In particular, he testified that

use-of-force decision-making is important, but admitted the Department provided no

such training.[52]  Such training, he acknowledged, would have been "helpful" to Rooks

on October 6, 2008.[53]

Given this evidence, the Court finds genuine issues of material fact exist as to

whether the Department's training program (or lack thereof) constituted "deliberate

indifference" and whether its failure to train Rooks caused the excessive force.  On

balance, then, the Court finds the evidence sufficient to allow a jury to decide Plaintiff's

third claim – whether the Department is liable for its alleged failure to adequately train

Rooks.

        *d)*     *Claim Four – Whether the Department is liable for hiring, retaining, and assigning Rooks to patrol duty*

Plaintiff also asserts a fourth claim against the Department.  He alleges it is liable

for hiring, retaining, and assigning Rooks to patrol duty.  As to hiring, when a plaintiff

alleges municipal liability based on a single hiring decision, "a court must carefully test

---

[49]  (Doc. # 72-3 at 128:6 to 129:3.)

[50]  (Doc. # 72-6 at 24:8-10; 31:8 to 32:9 ;98:22 to 99:5.)

[51]  (Doc. # 72-2, Ex. 2, Rule 30(b)(6) Deposition of Neal McQuarie, at 109:3 to 110:4.)

[52]  (*Id.* at 110:13-19.)

[53]  (*Id.* at 110:25 to 111:7.)

the link between the policymaker's inadequate decision and the particular injury alleged." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997). A plaintiff's success depends on "a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id*. at 412.

Plaintiff's evidence is lacking. He does not present evidence raising a genuine issue whether the "plainly obvious consequence" of the Department's decision to hire Rooks would be his use of excessive force. *Id*. at 411. The job interview notes suggest that Rooks was quick to draw his gun in a crowd situation; this, however, is insufficient to create a genuine issue as to whether the "plainly obvious consequence" of hiring Rooks would be that he would use excessive force on a third party. In addition, although Rooks had several driving infractions prior to his employment with the Department, that record does not create a genuine issue that the "plainly obvious consequence" of hiring Rooks would be his use of excessive force with his patrol vehicle. In any event, Plaintiff does not cite this evidence in support of his theory.[54] Thus, he fails to satisfy his burden on summary judgment. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

Accordingly, to the extent Plaintiff alleges that the Department is liable because of its decision to hire Rooks, the Court dismisses the claim as unsupported by the evidence. To the extent Plaintiff alleges the Department is liable for retaining Rooks and assigning Rooks to patrol duty, the Court finds these allegations subsumed by Plaintiff's "failure to train" claim.

---

[54] (Doc. # 72 at 29-30.)

Indeed, the Court observes that all of Plaintiff's claims against the Department are essentially alleging the same theory of liability – that the Department is directly liable for causing Plaintiff's constitutional deprivations. They differ only in their theories of causation. *See Dodds v. Richardson*, No. 09-6157, --- F.3d ----, 2010 WL 3064002, *15 (10th Cir. August 6, 2010) (Tymkovitch, J., concurring) ("These examples – official policy, decisions of high-ranking officials, and failure to adequately train employees – are not rightfully regarded as theories of liability but should instead be viewed as theories of causation.") The first two claims allege that the Department's policies were the "moving force" behind Plaintiff's injuries.[55] The third alleges the Department's "failure to train or supervise" caused Plaintiff's injuries. And the fourth alleges the Department's "hiring, retention, and duty assignment" are the cause of Plaintiff's injuries.

Thus, although Plaintiff has labeled them as four distinct claims, the Court finds they amount to a single "municipal liability" claim against the Department. Given its above findings and conclusions, the Court will allow Plaintiff to proceed to trial on this claim – with an accompanying theory that the "cause" of Plaintiff's deprivations was the Department's failure to adequately train Rooks. Accordingly, the Court will proceed to trial on a single claim of liability against the Department and two (the excessive force claims) against Rooks.

---

[55] As mentioned, the Court will dismiss Plaintiff's first two claims against the Department for Plaintiff's failure to identify a particular policy, custom, or practice that was the "moving force" behind the alleged violation of Plaintiff's fourth amendment rights.

## III.  CONCLUSION

For the foregoing reasons, the Court DISMISSES IN PART and GRANTS IN

PART Defendants' Motion for Summary Judgment (Doc. # 70).

*Claims One and Two*:

•       The motion is GRANTED with respect to Plaintiff's Claims One and Two

against the Department.  It is DENIED with respect to Plaintiff's Claims

One and Two against Rooks.

*Claim Three*:

•       The motion is DENIED with respect to Plaintiff's Claim Three.

*Claim Four*:

•       Finally, as to Plaintiff's Claim Four, the Court finds it presents only

alternate theories of causation on Plaintiff's municipal liability claim against

the Department.  Thus, with the exception of Plaintiff's "inadequate hiring"

theory, the Court finds Claim Four subsumed within Claim Three.

DATED:  September   20  , 2010

                                BY THE COURT:

                                _____
                                CHRISTINE M. ARGUELLO
                                United States District Judge